22 Cal.App.4th 477 (1994)
27 Cal. Rptr.2d 507
PENNSYLVANIA HEALTH & LIFE INSURANCE GUARANTY ASSOCIATION, Petitioner,
v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; KATHLEEN A. LAUGHLIN et al., Real Parties in Interest.
Docket No. D018453.
Court of Appeals of California, Fourth District, Division One.
February 10, 1994.
*479 COUNSEL
Viviano & Bradley, Elizabeth Franco Bradley and Daniel A. Martorella for Petitioner.
Lord, Bissell & Brook, Jeri Rouse Looney and C. Guerry Collins as Amici Curiae on behalf of Petitioner.
Procopio, Cory, Hargreaves & Savitch, Gary Kennedy, Thomas R. Laube, Paul B. Wells, Gray, Cary, Ames & Frye, Terri P. Durham, Harvey, Pennington, Herting & Renneisen and James M. Brogan for Real Parties in Interest.
OPINION
NARES, J.
Plaintiff Kathleen A. Laughlin (Kathleen) brought this action against petitioner Pennsylvania Health & Life Insurance Guaranty Association (PHLIGA) and others,[1] seeking to recover as a beneficiary of her deceased husband David Laughlin's (David) life insurance policy issued by a Pennsylvania insurance company which later became insolvent. PHLIGA seeks a writ of mandate directing the respondent court to grant PHLIGA's motion to quash service of summons for lack of personal jurisdiction. Because PHLIGA does not have minimum contacts with California, did not consent to be sued in this state, and stands in a different position from its failed insurer for jurisdictional purposes, California cannot constitutionally exercise jurisdiction over PHLIGA. We therefore grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND
In 1983, the Life Assurance Company of Pennsylvania (LACOP) issued a $100,000 life insurance policy to David, a California resident. From 1985 through January 1991, David paid his monthly premiums through an automatic bank draft, by which the payments were automatically withdrawn from his California checking account. In January 1991, LACOP became insolvent. Pursuant to the Pennsylvania Life and Health Insurance Guaranty Association Act (40 Pa. Cons. Stat. § 1801 et seq.) (Pennsylvania Act),[2] PHLIGA assumed LACOP's obligations with respect to certain policies, including David's policy, pending PHLIGA's transferring the obligations to another insurer.
*480 On January 21, 1991, PHLIGA[3] sent a letter to David at a California address, where David had not lived for six years.[4] The letter stated LACOP would no longer accept premiums through the automatic bank draft procedure and instead required insureds to make direct monthly payments to the insurance company in Pennsylvania. David allegedly never received this letter and believed his premiums continued to be paid automatically through his bank account. PHLIGA subsequently sent another notice to the same California address stating David's policy had "lapsed" for lack of payment. On June 1, 1991, PHLIGA entered into an assumption reinsurance agreement by which Jackson National Life Insurance Company (Jackson) agreed to assume certain of PHLIGA's obligations with respect to LACOP.
David died in September 1991. Jackson rejected Kathleen's claim for coverage on the ground the policy had lapsed for nonpayment of premiums. Kathleen sued LACOP, Jackson, and PHLIGA, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. PHLIGA appeared specially to move to quash service of process based on the lack of in personam jurisdiction. After examining papers submitted by both parties and hearing argument, the court denied the motion.

DISCUSSION

I
(1) When a defendant moves to quash out-of-state service for lack of personal jurisdiction, the plaintiff has the burden of establishing by a preponderance of the evidence jurisdiction is proper. (Bruns v. DeSoto Operating Co. (1988) 204 Cal. App.3d 876, 880 [251 Cal. Rptr. 462]; A.I.U. Ins. Co. v. Superior Court (1986) 177 Cal. App.3d 281, 285 [222 Cal. Rptr. 880].) Where there is a conflict in the evidence, the findings of the trial court will not be disturbed on appeal if supported by substantial evidence. (Ibid.) Thus, in reviewing an order denying a motion to quash, we examine the jurisdictional facts in the light most favorable to the plaintiff. When the evidence of jurisdictional facts is not conflicting, the question of whether a defendant is subject to personal jurisdiction is one of law. (Great-West Life Assurance Co. v. Guarantee Co. of North America (1988) 205 Cal. App.3d *481 199, 204 [252 Cal. Rptr. 363]; Felix v. Bomoro Kommanditgellschaft (1987) 196 Cal. App.3d 106, 111 [241 Cal. Rptr. 670, 69 A.L.R.4th 1].)

II
(2) A California court may exercise jurisdiction on any basis not inconsistent with the federal or state Constitution. (Code Civ. Proc., § 410.10.) In Burger King Corp. v. Rudzewicz (1985) 471 U.S. 462 [85 L.Ed.2d 528, 105 S.Ct. 2174], the United States Supreme Court reiterated the fundamental principles guiding the determination whether a state may constitutionally exercise personal jurisdiction over a nonresident defendant. In so doing, the court made clear the critical test is whether the defendant "purposefully established `minimum contacts' in the forum State." (Id. at p. 474 [85 L.Ed.2d at pp. 541-542], citing International Shoe Co. v. Washington (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 101-102, 66 S.Ct. 154, 161 A.L.R. 1057], italics added.) To show such minimum contacts, "`it is essential ... [the plaintiff establish] some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefit and protections of its laws.'" (471 U.S. at p. 475 [85 L.Ed.2d at p. 542], quoting Hanson v. Denckla (1958) 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1297-1298, 78 S.Ct. 1228].) Additionally, the defendant's contacts with the forum must be "`such that he should reasonably anticipate being haled into court there.'" (Id. at p. 474 [85 L.Ed.2d at p. 542], quoting World-Wide Volkswagen Corp. v. Woodson (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 501-502, 100 S.Ct. 559].)
Where, as here, "the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him, then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action." (Cornelison v. Chaney (1976) 16 Cal.3d 143, 148 [127 Cal. Rptr. 352, 545 P.2d 264].) The question whether jurisdiction exists depends on the particular facts of each case and cannot be decided by applying a mechanical test or a precise formula. (Burger King Corp. v. Rudzewicz, supra, 471 U.S. at pp. 478-479 [85 L.Ed.2d at pp. 544-545]; Cornelison v. Chaney, supra, 16 Cal.3d at p. 150.)

III
(3) Guided by these principles, we examine the record to evaluate the nature of PHLIGA's contacts with California.
*482 PHLIGA is a statutory entity created to "protect policyowners, insureds, [and] beneficiaries" in the event a life insurer becomes impaired or insolvent.[5] (40 Pa. Cons. Stat. § 1802.) When a domestic insurer becomes insolvent, PHLIGA is obligated to (1) "guarantee, assume, or reinsure" the insurer's "covered policies"; (2) "assure payment" of the insurer's "contractual obligations"; or (3) "provide such moneys ... or other means as are reasonably necessary to discharge such duties." (40 Pa. Cons. Stat. § 1807, subd. (b)(3).) In carrying out these duties, PHLIGA has broad authority to "[e]xercise ... the powers of an insolvent domestic life ... insurer" including to enter into contracts, borrow money, sue or be sued, and take legal action as may be necessary to avoid payment of improper claims. (40 Pa. Cons. Stat. § 1807, subd. (k).) The Pennsylvania Legislature made clear, however, PHLIGA is not an insurance company and has no power to "issue insurance policies or annuity contracts other than those issued to perform the contractual obligations of the ... insolvent insurer." (40 Pa. Cons. Stat. § 1807, subd. (k)(7).) PHLIGA is a nonprofit organization funded through involuntary assessments on all life insurers doing business in Pennsylvania. (40 Pa. Cons. Stat. § 1808.)
In support of its motion to quash, PHLIGA produced evidence showing it is not authorized to engage in business in California and it has never maintained any offices, solicited any business, or issued any insurance policies in this state. In opposition to the motion, Kathleen did not dispute these facts. Instead, she submitted copies of the two letters sent by PHLIGA[6] to David at his former California address, attempting to notify him of the change in premium payment procedures. (See ante, at p. 480.) Kathleen *483 further directed the court to the language of the Pennsylvania Act, emphasizing the statutory provisions stating PHLIGA's purpose is to "guaranty ... payment of benefits and ... continuation of coverages" (40 Pa. Cons. Stat. § 1802, italics added) and providing PHLIGA with broad powers to act on behalf of the failed insurer to achieve these goals. (40 Pa. Cons. Stat. § 1807, subds. (b) and (k).)
Based on this record, Kathleen essentially made two distinct arguments in support of jurisdiction: (1) by sending the correspondence to David in California, PHLIGA purposefully availed itself of the privilege of conducting activity within the state and therefore had the requisite minimum contacts with the state; and (2) by expressly assuming LACOP's obligations and guaranteeing payment of benefits, PHLIGA consented to jurisdiction in this state and/or "stood in the shoes" of the failed insurer for jurisdictional purposes, relying on Olivier v. Merritt Dredging Company, Inc., supra, 979 F.2d 827. We examine each of these arguments below.

Minimum Contacts
It is undisputed PHLIGA's two letters to David were PHLIGA's only direct contact with this state. As acknowledged by Kathleen, PHLIGA sent the letters as a part of its effort to wind up the affairs of LACOP and to structure LACOP's insurance policies in such a way as to render them attractive to other Pennsylvania insurance companies to which PHLIGA would offer to transfer the LACOP business. Viewing PHLIGA's actions in this context, PHLIGA did not "direct" its activities toward a California resident or "purposefully avail" itself of benefits and protections of this state by sending the two letters. Rather, the correspondence was sent into California as an indirect result of PHLIGA's intrastate liquidating activities. The letters are therefore an insufficient basis upon which to predicate the exercise of jurisdiction in this case. In reaching this conclusion, we are unpersuaded by Kathleen's focus on the fact that the California correspondence triggered the alleged wrongful cancellation of the policy. Absent some form of "purposeful availment," the fact a defendant's conduct in the forum state has some relationship to the causes of action asserted in the lawsuit, cannot, in and of itself, render jurisdiction reasonable.
*484 McGee v. International Life Ins. Co. (1957) 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199], relied upon by Kathleen, is distinguishable. In McGee, the defendant Texas insurance company issued an insurance policy through the mail to a California resident, who paid his premiums by mailing them to the defendant's Texas office. After the resident died and the company refused to pay on the policy, the beneficiary brought an action in California. Although the defendant had never solicited or conducted any business in California apart from the insurance policy involved in the lawsuit, the United States Supreme Court held the California court could exercise jurisdiction, emphasizing the suit was based on a contract with a "substantial connection" to the state and California had a manifest interest in providing a means of redress for its residents when their insurers refuse to pay claims.
Under McGee there is no question but that LACOP had sufficient contacts with California to establish a basis for jurisdiction against the insurance company. The question before us, however, is whether the court could constitutionally assert jurisdiction over PHLIGA, an entity separate from LACOP. Unlike LACOP and the insurer in McGee, PHLIGA had no involvement in soliciting or issuing the policy, did not enter into a contract with a California resident and did not seek to profit from or engage in any economic activity in California. PHLIGA merely sent two letters to a California resident as part of its activities in liquidating the company. Such acts having only an "attenuated connection" with this state are insufficient to support the exercise of jurisdiction. (See Hanson v. Denckla, supra, 357 U.S. at pp. 252-253 [2 L.Ed.2d at pp. 1297-1298]; In re Marriage of Martin (1989) 207 Cal. App.3d 1426, 1436-37 [255 Cal. Rptr. 720] [stressing that in McGee the defendant insurance company actively engaged in California business activity by soliciting the policy in this state].) McGee stands for the principle a single act may be sufficient to support jurisdiction if that act reflects a substantial connection with the state. Contrary to Kathleen's assertions, McGee has never been construed to mean that a defendant's single act in this state will always support jurisdiction merely because the plaintiff is a California resident and an insurance policy is involved in the lawsuit.

PHLIGA's Role Acting on Behalf of LACOP
Kathleen alternatively contends that PHLIGA, by acting on behalf of or as the guarantor of the failed insured, "stood in the shoes" of the insolvent insurer for jurisdictional purposes and thus impliedly consented to jurisdiction. (See Burger King Corp. v. Rudzewicz, supra, 471 U.S. at p. 472, fn. 14 *485 [85 L.Ed.2d at p. 540] ["... because the personal jurisdiction requirement is a waivable right, there are a `variety of legal arrangements' by which a litigant may give `express or implied consent to the personal jurisdiction of the court'"].) In support of these theories, Kathleen relies primarily on Olivier v. Merritt Dredging Co., Inc., supra, 979 F.2d 827, which upheld an Alabama court's jurisdiction over two out-of-state insurance guaranty associations.[7] In that case, the plaintiff, a Louisiana resident, was injured in Alabama while employed by a South Carolina dredging company, which subsequently filed for bankruptcy. The employer's insurer, which provided coverage for injuries occurring in Alabama, was later declared insolvent. After the plaintiff obtained a judgment against his employer, he petitioned for writs of garnishment in Alabama, seeking to recover against the Louisiana and South Carolina insurance guaranty associations.
Examining the history and purpose of the guaranty associations, Olivier rejected the guaranty associations' contentions they would be denied due process if they were subject to jurisdiction in Alabama based on the unilateral activity of the failed insurance company. The court reasoned that because the member insurers initially supported the creation of the state associations as a way to preclude federal regulation and because the state legislatures intended the associations to act as the failed insurer's "alter ego" and to "stand in the shoes" of the insolvent insurer, the associations impliedly "consented to jurisdiction." (Olivier v. Merritt Dredging Co., Inc., supra, 979 F.2d at pp. 832-833.) Olivier also pointed out that by assuming all the "rights, duties, and obligations" of the insolvent insurer, the associations had "fair warning that they could be subject to suit for `covered claims' in jurisdictions outside their respective states." (Id. at p. 833.) The court concluded jurisdiction would be consistent with fair play and substantial justice, focusing on the minimal burden to the guaranty associations if they were required to litigate in Alabama as compared with the substantial burden on the plaintiff if he were required to seek relief in three different forums. (Id. at p. 834.)
We are unpersuaded by Olivier's analysis. First, while it is true the Pennsylvania guaranty association stands in the shoes of an insolvent insurer for some purposes, the extent of PHLIGA's liability is strictly limited to *486 statutorily defined "covered claims" and therefore its obligations are not necessarily coextensive with the insolvent insurer. (See 40 Pa. Cons. Stat. § 1807, subd. (k) [placing a monetary cap on PHLIGA's liability to each claimant]; see also Isaacson v. California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 786-787 [244 Cal. Rptr. 655, 750 P.2d 297] [expressly rejecting the argument that the California Insurance Guarantee Association is the "assignee" of a failed insurer or "stands in the shoes" of the insolvent insurer for all purposes].)[8] Equally significant, PHLIGA is not in the "business" of insurance and did not assume the obligations of the insolvent company for the purpose of deriving an economic benefit. Rather, it is a nonprofit statutory entity created to spread the risk of loss due to an insurer's insolvency and to provide limited protection for those claimants who would otherwise have nowhere to turn and would suffer a total loss of their investments. Viewing the guaranty association from this perspective, we cannot characterize PHLIGA and its failed insurer as "one and the same" for jurisdictional purposes. (Compare Bruns v. DeSoto Operating Co., supra, 204 Cal. App.3d 876 [Texas corporation subject to California jurisdiction based on corporation's assumption of benefits and obligations of a California contract which corporation assumed for the purpose of deriving an economic benefit].)
Moreover, unlike the Olivier court, we are unable to discern any facts showing the guaranty association expressly or impliedly consented to be sued in any state in which a member insurer conducted business. We are aware the pre-1993 version of the Pennsylvania Act guaranteed an insured's claim in the event of a domestic insurer's insolvency, regardless whether the insured was a Pennsylvania resident. This contrasts with provisions in the model act and many of the other states, including California, which provide nonresidents with coverage only in specified circumstances. (See 3 Nat. Assn. of Ins. Comrs., Model Ins. Laws, Regs. and Guidelines, supra, § 3, p. 520-2 [Life and Health Insurance Guaranty Association Model Act]; Ins. Code, § 1067.02, subd. (a)(2)(B).) However, Kathleen has not pointed to, nor has our own research revealed, anything in the Pennsylvania Act's legislative history or statutory language supporting a conclusion that this broader coverage necessarily reflected PHLIGA's implied consent to be sued in California. In fact, it is just as likely this broader and more expensive coverage rendered PHLIGA less willing and capable of litigating in a foreign forum. While PHLIGA knew it would be obligated to cover claims of *487 out-of-state residents, this did not necessarily establish that PHLIGA consented to litigate coverage disputes in the forum in which the insured resides, nor did such knowledge render it reasonably foreseeable PHLIGA would be haled into an out-of-state forum for its conduct.[9]
Further, our Supreme Court has long recognized a guaranty relationship by itself is insufficient to establish jurisdiction. (See Sibley v. Superior Court (1976) 16 Cal.3d 442 [128 Cal. Rptr. 34, 546 P.2d 322].) Sibley held a California court could not constitutionally assert jurisdiction over a nonresident defendant who had guaranteed the performance of a Georgia corporation, even though the defendant knew the Georgia corporation's breach of the agreement would have an effect in California and that its issuance of the guaranty would influence the plaintiff California corporation to enter into the underlying agreement. Sibley stressed that by guaranteeing the obligation, the defendant did not "anticipate[] that he would derive any economic benefit" nor "intend[] to conduct business or in any other way directly or indirectly gain from dealings in this state." (Id. at pp. 447-448.) The same is true of PHLIGA's conduct in this case.[10]
While it is conceivable that given its broad powers an insurance guaranty association could engage in activities beyond the role of a guarantor, there is no evidence PHLIGA did so in this case. Instead, the undisputed record shows PHLIGA assumed LACOP's obligations for four and one-half months, during which it acted primarily to assume responsibilities for any "covered claims" and to liquidate and transfer the company's assets and obligations.
Generally, jurisdiction over a nonresident must be based on an analysis of the relationship between that defendant and the forum state. (See Sibley v. Superior Court, supra, 16 Cal.3d at p. 448 ["... the purpose of other parties cannot be imputed to [a defendant] for the purpose of assuming personal jurisdiction over him"]; Burger King Corp. v. Rudzewicz, supra, 471 U.S. at p. 475 [85 L.Ed.2d at pp. 542-543] [a defendant may not be "haled into a jurisdiction solely as a result of ... the `unilateral activity of another party or a third person.' [Citation.]"].) We see no principled basis for creating an exception to that rule in this case. (See Georgia Insurers Insol. Pool v. *488 Brewer, supra, 602 So.2d at p. 1267 ["... due process analysis ... compels that an independent basis of personal jurisdiction over [the guaranty association] be established apart from [the insolvent insurer's] activities in this state].")

IV
In reaching our conclusion, we are aware of California's substantial interest in providing its residents with a convenient forum to assert and enforce their rights under insurance policies with out-of-state insurance companies. (See Ins. Code, §§ 1610-1620; McGee v. International Life Ins. Co., supra, 355 U.S. at pp. 223-224 [2 L.Ed.2d at pp. 226-227].) But as our Supreme Court has made clear, a state insurance guaranty association differs substantially from an ordinary insurance company; it is a nonprofit statutory entity charged with providing limited protection to insureds in the case of an insolvency. (Isaacson v. California Ins. Guarantee Assn., supra, 44 Cal.3d at pp. 786-787.) California's interest in forcing such out-of-state entity to litigate here becomes less significant when considering that the exercise of such jurisdiction could likely have the long-term effect of undermining the effectiveness and purpose of the statutory guaranty funds. Moreover, the fact a state may have a strong interest in providing a forum is insufficient by itself to create a basis for jurisdiction. Absent a defendant's "minimum contacts" with California or consent to be sued here, the defendant's due process rights preclude a court from asserting authority over him. Finally, we note our decision does not preclude Kathleen from seeking relief in Pennsylvania, or in any way insulate PHLIGA from responsibility for its allegedly wrongful acts.

DISPOSITION
Let a writ of mandate issue directing the superior court to vacate the order denying the motion to quash and enter an order consistent with this opinion.
Kremer, P.J., and Work, J., concurred.
NOTES
[1] The other defendants named in the complaint were Life Assurance Company of Pennsylvania and Jackson National Life Insurance Company. Kathleen later settled with Jackson.
[2] Effective 1993, the Pennsylvania Legislature repealed the existing statutory scheme (40 Pa. Cons. Stat. § 1801 et seq.) and replaced it with provisions contained at 40 Pennsylvania Consolidated Statutes sections 991.1701 through 991.1717. While the recent legislation substantially modified certain provisions of the Pennsylvania Act, this action arose before 1993. We therefore assume, as did the parties, that the pre-1993 legislation applies. Thus, all further statutory references will be to the earlier version of the Pennsylvania Act unless otherwise specified.
[3] For purposes of our jurisdictional analysis, we reject PHLIGA's factual contention it was not responsible for sending the letter to David. (See post, at p. 482, fn. 6.)
[4] LACOP allegedly had actual notice in its files that David had a new address and had moved at least six years earlier.
[5] Almost every state has created some form of public or quasi-public insurance guaranty association providing protection to people suffering losses due to the insolvency of casualty, property, and life insurers. (See Olivier v. Merritt Dredging Co. Inc. (11th Cir.1992) 979 F.2d 827, 830; Lasley et al., Insurance Guaranty Funds: The New `Money Pit'? (Mar. 1, 1987) 416 Practicing Law Institute, Com. 113.) Most states maintain separate associations for casualty/property insurers and for life insurers. The various state guaranty associations share many common characteristics and function in essentially the same manner, since most state legislation was patterned after model acts promulgated by the National Association of Insurance Commissioners. (See 3 Nat. Assn. of Ins. Comrs., Model Ins. Laws, Regs. and Guidelines (1987) 540-1 [Post-Assessment Property and Liability Insurance Guaranty Association Model Act] and 520-1 (1988) [Life and Health Insurance Guaranty Association Model Act].)

Since 1969 California has maintained an insurance guarantee fund to protect against losses due to property and/or casualty insurer insolvencies. (Ins. Code, § 1063 et seq.) In 1991, the Legislature created an analogous guarantee fund to protect against losses due to the insolvency of a life insurer. (See Ins. Code, § 1067 et seq.) The California Insurance Guarantee Association has filed an amicus curiae brief in support of PHLIGA's position in this case.
[6] In the proceedings below, PHLIGA argued the letters did not reflect its "contact" with California because it did not send the letters or cause the letters to be sent to David. In support of this argument, PHLIGA proffered a declaration of a senior account analyst with the Pennsylvania Insurance Department who said the letters were sent by LACOP at the direction of the Pennsylvania Insurance Commissioner. Viewing the record in the light most favorable to the plaintiff, there is sufficient evidence showing the ommissioner's direction to send the letters was an act on behalf of the PHLIGA. Thus, the commissioner's involvement did not eliminate PHLIGA's responsibility for the letters for the purposes of analyzing minimum contacts. Such conclusion is consistent with the statutory scheme. (See, e.g., 40 Pa. Cons. Stat. § 1805, subd. (c) [PHLIGA is "under the immediate supervision of the commissioner"]; § 1807, subd. (e) [the commissioner has PHLIGA's "powers and duties ... with respect to insolvent insurers" if PHLIGA "fails to act within a reasonable period of time"].)
[7] There is a conflict of authority among the courts as to whether a state may constitutionally exercise jurisdiction over another state's insurance guaranty fund. (Compare Olivier v. Merritt Dredging Co., Inc., supra, 979 F.2d 827 [upholding jurisdiction] and Bell v. Senn Trucking Co. of Newberry (1992) 308 S.C. 364 [418 S.E.2d 310] [upholding jurisdiction] with Georgia Insurers Insol. Pool v. Brewer (Fla. 1992) 602 So.2d 1264 [no jurisdiction] Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n. (S.D.N.Y. 1989) 715 F. Supp. 94 [no jurisdiction].)
[8] Isaacson did not involve a jurisdictional issue. Rather, the court held, based in part on its view that the California guarantee association stood in a position different from a failed insurer, that the association could not be held liable for statutory or common law bad faith or intentional infliction of emotional distress when those claims arose in the context of the association's claims adjustment activities.
[9] While it is likely any sophisticated defendant such as PHLIGA may have anticipated a plaintiff harmed by its conduct would attempt to bring suit in the state in which the plaintiff resides, such form of foreseeability is insufficient to create jurisdiction where, as here, there was no minimum contacts and no purposeful availment. (See Pacific Atlantic Trading Co. v. M/V Main Exp. (9th Cir.1985) 758 F.2d 1325, 1329.)
[10] Sibley also found it significant that the plaintiff did not assume any obligations to the defendant guarantor which the plaintiff "might have sought to enforce in California." (Sibley v. Superior Court, supra, 16 Cal.3d at p. 447.) Kathleen fails to point to any obligation assumed by PHLIGA with respect to David's insurance policy which PHLIGA sought or could have sought to enforce in the courts of this state.